**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JACKIE WAYNE, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 8540** |
| | ) | |
| **OFFICER RALPH KIRK #21, OFFICER** | ) | **Magistrate Judge Finnegan** |
| **FERNANDO MUNIZ #44, SGT. FABIANI** | ) | |
| **#6, OFFICER BILL COPP #37 and** | ) | |
| **VILLAGE OF STONE PARK, an Illinois** | ) | |
| **Municipal Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jackie Wayne, Jr. has filed suit charging the Village of Stone Park and four of its police officers with, among other things, false arrest and excessive force in violation of 42 U.S.C. § 1983, malicious prosecution, battery, and intentional infliction of emotional distress, all stemming from his arrest and a take-down to the ground on February 24, 2013. Plaintiff alleges that the Defendants' actions caused him to suffer severe emotional distress, including post-traumatic stress disorder ("PTSD"), anxiety, depression, paranoia and fear. On May 21, 2015, Plaintiff underwent a Rule 35 examination by a psychiatrist and neuropsychologist retained by Defendants. Now before the Court is Plaintiff's Motion to Compel Expert Opinion Basis Materials. (Doc. 107). The expert physicians ("Respondents") have retained their own counsel and oppose the motion. They insist that legal, ethical and contractual obligations permit them to disclose neuropsychological test materials and raw data only to a psychologist designated by Plaintiff. Plaintiff insists that these materials should be produced directly

to his attorney. For the reasons set forth below, the motion is granted in part and denied in part.

**BACKGROUND**

**A.      Events on February 24, 2013[1]**

Just before 2:00 a.m. on February 24, 2013, Plaintiff and five friends were leaving a bar when they were approached by two Stone Park police officers. One officer pushed three of the men and shouted obscenities at them. They also called for backup, resulting in the arrival of Defendant Officers Copp and Fabiani who had words with Plaintiff, handcuffed him behind his back, and slammed him onto the hood of a car. When he asked why he was handcuffed and what he had done wrong, Officers Copp and Fabiani lifted him off the ground and dropped him on his face, fracturing his nose and giving him a concussion. At the police station, Plaintiff refused medical attention and refused to go through the booking process for several hours. After his release, however, he went on his own to the emergency room for treatment. While Plaintiff was charged that day with obstructing/resisting a peace officer and disturbing the peace, he was found not guilty in July 2013. Approximately four months later, on November 26, 2013, he filed this civil lawsuit.

**B.      Treatment and Diagnosis (November 2013 to January 2014)**

After the incident in February 2013, Plaintiff missed a week of work but did not seek any mental health treatment. On November 1, 2013, however, he stopped working completely, and four days later went to see an advanced practice nurse, complaining of depression, panic attacks, anxiety and other symptoms. After screening

---

[1]      These facts are drawn from the district judge's ruling on Defendants' motion for summary judgment, *Wayne v. Kirk*, No. 13 C 8540, 2015 WL 5950900 (N.D. Ill. Oct. 13, 2015), so are either undisputed or are construed in the light most favorable to Plaintiff.

him, the nurse referred Plaintiff to clinical psychologist Dawn Niedner for counseling. Plaintiff saw Dr. Niedner four times. At the first visit on November 12, 2013, Plaintiff told her about the arrest and injury in February 2013 and the symptoms he had been experiencing. Dr. Niedner diagnosed PTSD and recommended weekly psychotherapy sessions. Plaintiff went to Dr. Niedner for therapy three times: on December 5, 2013, January 2, 2014 and January 30, 2014. At one of these sessions, she administered two tests, namely, Goldberg's Self-Rating Depression Scale and the Hamilton Anxiety Scale. She also completed paperwork for Plaintiff to apply for disability since he was unable to return to work due to panic attacks and other symptoms.

Dr. Niedner referred Plaintiff to a psychiatrist, Dr. Jain, for a medication evaluation. Dr. Jain saw Plaintiff on November 20, 2013, and again on December 27, 2013. In addition to prescribing medication, Dr. Jain diagnosed Plaintiff with PTSD and depression not otherwise specified. Plaintiff did not seek any mental health therapy or treatment after January 30, 2014. In March 2014, he began a new job.

## C.     Plaintiff's Rule 35 Exam

About a year later, on March 31, 2015, Defendants filed a motion for a Rule 35 mental examination of Plaintiff. (Doc. 56, 57, 61). Defendants had retained psychiatrist Daniel Yohanna to provide an opinion as to Plaintiff's mental health conditions and/or injuries following the arrest, as well as his current mental health status (Plaintiff alleges that he still experiences some symptoms). Dr. Yohanna's opinion was to be based on his review of certain records in the case, as well as an Independent Medical Evaluation ("IME") and neuropsychological testing. Dr. Yohanna made a referral to another doctor, Joseph Fink, Ph.D., to conduct the neuropsychological testing. As a neuropsychologist,

Dr. Fink has special training in administering and interpreting these tests that Dr. Yohanna does not.

Over objection, the Court granted the motion for the Rule 35 examination, though it required Dr. Yohanna and Dr. Fink to conduct a joint clinical interview of Plaintiff rather than separate interviews. (Doc. 72). The evaluation was done on May 21, 2015. After Plaintiff completed the University of Chicago Neuropsychological History Questionnaire and responded to questions during the joint clinical interview, Dr. Fink and his Neuropsychology Technician administered 14 neuropsychological tests. (Doc. 107-1, at 2). Based on the results, Dr. Fink concluded (in part) that certain areas of cognitive functioning that are commonly impaired in persons with "significant psychological complaints were areas of strength for [Plaintiff]. Nonetheless, the symptoms endorsed across self-report measures suggest that [Plaintiff] is currently experiencing some residual psychological distress that he associates with the traumatic event of his February 2013 arrest." (Fink Report, at 2388). Dr. Fink further stated: "In light of the overall clinical picture, these symptoms are consistent with a subsyndromal manifestation of PTSD." (*Id.*).[2] Dr. Fink described the test results and his findings in a Neuropsychological Consultation report that was provided to Dr. Yohanna and later produced to Plaintiff. Dr. Fink noted that Dr. Yohanna was "submitting a separate comprehensive psychiatric report, to include a review of collateral records." (*Id.* at 2380).

---

[2] "Subsyndromal" is defined in the Merriam-Webster online dictionary as "characterized by or exhibiting symptoms that are not severe enough for diagnosis as a clinically recognized syndrome." (http://www.merriam-webster.com/medical/subsyndromal) (last visited Jan. 25, 2016).

Dr. Yohanna, the Defendants' designated Rule 26(a)(2)(B) expert, observed in his own report that it is "customary to complete neuropsychological testing during an IME to assist in forming opinions about the patient's general cognitive abilities and personality[,]" and that he reasonably relied on the tests and Dr. Fink's interpretation of them. (Yohanna Report, at 2219). He also noted that "for completeness" he had included the test results, as well as his opinion "formed from those test results" in his report. (*Id.*). While Dr. Yohanna's report incorporates the entirety of Dr. Fink's description of the neuropsychological tests and results, it also contains a summary and analysis of other materials. Specifically, the report identifies 21 sources of information with only the last being the IME and Neuropsychological Testing. The other sources include such things as police reports, medical records (before and after the arrest), deposition transcripts, employment records, and disability insurance records. (*Id.* at 2218-19).

Dr. Yohanna concluded from his consideration of the sources of information that Plaintiff was "malingering symptoms of PTSD, depression, and anxiety for secondary gain" and did not suffer any of these symptoms on February 24, 2013 or afterwards. (*Id.* at 2246). He noted in this regard that while Plaintiff "met criteria for PTSD in the subjective examinations during the IME, testing and in the initial visit with his therapist Dr. Niedner and psychiatrist as outlined in the DSM-IV, . . . there is significant evidence that . . . the timing and collateral information does not substantiate the typical and common presentation of PTSD." (*Id.* at 2242). In this regard, Dr. Yohanna observed that Plaintiff did not seek treatment for his alleged symptoms until "some 9 months after the incident and not until he met with attorneys to file a lawsuit...." (*Id.*). Dr. Yohanna

also described eighteen "discrepancies in [Plaintiff's] history" that he relied on in forming

his opinion that Plaintiff was malingering. (*Id.* at 2242-45).[3]

## D. Document Requests and Objections

Plaintiff served document requests seeking the following materials related to the

Rule 35 examination:

> Dr. Yohanna's and Dr. Fink's entire files related to this matter including,
> but not limited to, written or computer generated reports, narratives, test
> stimuli, interview notes, subject responses, psychological tests
> administered, neuropsychological tests administered, psychiatric tests
> administered, raw data and/or scaled scores of all testing
> administered, test manuals, letters, memos, notes, final and drafts of same, where said
> documents were not identified in Dr. Yohanna's or Dr. Fink's expert
> reports.

(Doc. 107-1, at 9, 13). Plaintiff already has received the reports and certain other

materials. At issue is the request for copies of the neuropsychological test materials

and the raw data from those tests. The raw data is solely in the possession of Dr. Fink

since Dr. Yohanna never received or reviewed that data.

Defendants have not produced these materials because Respondents will only

provide them to another psychologist who is designated by Plaintiff. They assert that

producing the materials directly to Plaintiff or his attorney would violate their ethical,

legal and contractual obligations. (*Id.* at 43, Email from E. Schnidt to P. Provenzale of

9/25/15). Consistent with this position, Respondents have provided an original and

amended privilege log identifying the withheld documents, and they are the only ones

---

[3]    For example, Dr. Yohanna noted that Plaintiff returned to his job one week after the
arrest and worked without incident until he abruptly stopped working on November 1, 2013;
there was no record that his work performance suffered and Plaintiff's supervisor who had
known him for several years did not notice any changes in his behavior. (Yohanna Report, at
2242-43).

formally objecting to Plaintiff's motion to compel. (Docs. 116, 123, 133). Respondents have also provided affidavits and other materials in support of their position.

Respondents' claimed legal obligations are found in an Illinois statute that provides: "Psychological material whose disclosure would compromise the objectivity or fairness of the testing process may not be disclosed to anyone including the subject of the test and is not subject to disclosure in any administrative, judicial or legislative proceeding." 740 ILCS 110/3(c). The provision goes on to state: "However any recipient who has been the subject of the psychological test shall have the right to have all records relating to that test disclosed *to any psychologist designated by the recipient*." *Id.* (emphasis added).

Respondents explain that their ethical obligations stem from the American Psychological Association Ethical Principles of Psychologists and Code of Conduct ("APA Code of Conduct"), and the American Psychiatric Association, The Principles of Medical Ethics. The APA Code of Conduct limits a doctor's ability to disclose two types of psychological information: "test data" and "test materials." Plaintiff's answers to test questions and his raw and scaled scores constitute test data; the "manuals, instruments, protocols, and test questions or stimuli" used to interpret those answers and scores constitute test materials. (Doc. 116-1, at 13-14, APA Code Standards 9.04, 9.11). With an appropriate release from Plaintiff, the Code would allow Respondents to disclose Plaintiff's test data directly to him and his designees. (*Id.* at 13). Without a release, Respondents could disclose test data "only as required by law or court order." (*Id.* at 14).

When it comes to test materials, on the other hand, the Code instructs that Respondents should "make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations, and in a manner that permits adherence to this Ethics Code." (*Id.* at 14).[4] As noted later, in some cases, the line between test data and test materials may blur, as revealing the answers to certain test questions may also disclose the underlying questions.

Respondents finally cite their contractual obligations to safeguard the materials in question. They note that the tests "were scored using the scoring methods and materials provided by the publisher of the respective tests," and the "standardized test materials are copyright-protected." (Doc. 116, at 5, 7). Respondents stress that these are not tests Plaintiff's counsel could purchase, and some are not even available to health care professionals if they lack the necessary "qualification levels." (*Id.*).

**E.     November 6, 2015 Hearing**

During a hearing on November 6, 2015, this Court sought to understand why Plaintiff's counsel was seeking direct access to the neuropsychological test materials and raw data, and what he would do with such materials given his lack of professional training. The Court also inquired as to whether Plaintiff intended to provide the test materials to his treating psychologists or to a retained psychologist who could explain them and help to rebut Dr. Yohanna's opinion that Plaintiff was malingering. If so, all of the test data and test materials could be produced directly to Plaintiff's designated

---

[4]     The American Psychiatric Association's "Principles of Medical Ethics" contains less specific language, requiring psychiatrists to "respect the rights of patients, colleagues, and other health professionals, and [to] safeguard patient confidences and privacy within the constraints of the law." (Doc. 116-1, at 26).

psychologist with a protective order, thereby resolving the ethical, legal and contractual concerns raised by Respondents.

What the Court learned, however, is that Plaintiff's counsel wanted to personally review the raw test data and testing materials *before* deciding whether it was necessary to send them for review by a treating or retained psychologist. Plaintiff's counsel said it was difficult to say whether the materials at issue would be helpful without first seeing them. He argued, however, that it was important to review them because Dr. Fink concluded from the neuropsychological testing that Plaintiff's symptoms were consistent with a subsyndromal manifestation of PTSD, while Dr. Yohanna--who relied on Dr. Fink's interpretation of the tests without viewing the raw data--nonetheless opined that Plaintiff was malingering symptoms of PTSD.

## F.     Opportunity to Review Materials

In light of the somewhat unusual circumstances presented here, the Court allowed Plaintiff's counsel to personally review on an "Attorney's Eyes Only" basis (but not copy) the neuropsychological tests and raw data. He was then to inform the Court as to whether he would withdraw his request for any of the testing materials as unnecessary, and whether he had decided to retain an expert to whom any remaining materials could be directly provided. (Doc. 127). Plaintiff's counsel spent approximately five hours over multiple days reviewing the neuropsychological testing materials. While counsel was unhappy that he was instructed not to make "verbatim" notes and that someone remained in the room during his review, he made good use of the time, identifying documents that were not needed as well as areas of inquiry for the experts.

In a supplemental pleading, Plaintiff explained that he no longer sought copies of nine of the items on the privilege log but continued to seek copies of the following materials:

1. Raw Data Sheet
2. Personality Assessment Inventory (PAI) Clinical Interpretive Report
3. Neuropsychological History Questionnaire
4. Minnesota Multiphasic Personality Inventory-2nd Edition (MMPI-2) Extended Score Report and Test Manuals
5. Trauma-Symptom Inventory-2 (TSI-2) Answer Sheet and Profile Form
6. Detailed Assessment of Post-Traumatic Stress-2 (DAPS) Item Booklet, Answer Sheet and Scoring Sheet
7. Beck Anxiety Inventory
8. Beck Depression Inventory-II

(Doc. 134, at 13-14).[5]

During oral argument on December 23, 2015, Plaintiff's counsel stated (in part) that he still had not retained a psychologist as a consultant because he did not need one. He indicated that he would decide after seeing how Dr. Yohanna and Dr. Fink answered questions at their depositions whether to request the treating or a retained psychologist to review the testing materials and raw data and offer rebuttal opinions. Counsel also acknowledged that there is a possibility that Plaintiff will undergo future psychological testing in this case. Counsel volunteered, however, that he would not show or discuss any test materials with his client, and said it was doubtful the same tests would be administered in any event.

---

[5] Plaintiff withdrew his request for Green's Word Memory Test; Test of Memory Malingering; Trail Making Test (A&B); RBANS; WAIS-IV Administrative & Scoring Manual; WAIS-IV Record Form; WAIS-IV Response Booklet; WRAT 4 Green Sentence Comprehension Test Form and Word Reasoning Green Test Form; and Mini-Mental Status Exam. (Doc. 134, at 5).

## DISCUSSION

### A. Protection of Test Materials

The privilege at issue here flows from a provision in the Illinois Mental Health and Developmental Disabilities Confidentiality Act (the "Illinois Act" or "Act"). This Act is referenced in the parties' "Qualified HIPAA and Confidential Matter Protective Order" entered on May 21, 2014. (Doc. 26). In fact, Plaintiff relied on other provisions of the Act as the basis for a motion to quash subpoenas to Plaintiff's treating mental health providers, (Doc. 27, at 2-3), and a motion to require *in camera* review of the mental health records from those physicians prior to Defendants receiving them. (Doc. 30). The provision of the Act invoked by Respondents states:

> Psychological material whose disclosure would compromise the objectivity or fairness of the testing process may not be disclosed to anyone including the subject of the test and is not subject to disclosure in any administrative, judicial or legislative proceeding. However, any recipient who has been the subject of the psychological test shall have the right to have all records relating to that test disclosed to any psychologist designated by the recipient.

740 ILCS 110/3(c). As licensed Illinois mental health professionals, Respondents are each obligated to comply with the Act.

While Plaintiff is correct that state evidentiary privileges do not apply in federal cases before the court based on federal-question jurisdiction, *Mayer v. Village of South Holland*, No. 07 C 5408, 2008 WL 4679483, at *2 (N.D. Ill. May 8, 2008), "comity between state and federal governments 'impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.'" *Scott v. City of Peoria*, 280 F.R.D. 419, 422 (C.D. Ill. 2011)

(quoting *Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981)).

There appears to be good reason for offering special protection to the psychological materials described in the Act. According to the *Official Statement of the National Academy of Neuropsychology*, "a major practice activity of neuropsychologists is the evaluation of behavior with neuropsychological test procedures[,] and many tests . . . depend to varying degrees on a lack of familiarity with the test items." (Doc. 116-1, at 87). As a result, "a likely and foreseeable consequence of uncontrolled test release [to non-psychologists] is widespread circulation, leading to the opportunity to determine answers in advance, and to manipulate test performances." (*Id.*). The Official Statement not only warns that "threats to test security" from release to non-psychologists are "significant" but cites research confirming that "individuals who gain access to test content can and do manipulate tests and coach others to manipulate results, and they are also more likely to circumvent methods for detecting test manipulation." (*Id.* at 86) (citing Coleman, Rapport, Millis, Ricker and Farchione, 1998; Wetter and Corrigan, 1995; Youngjohn, 1995; Youngjohn, Lees-Haley & Binder, 1999). In addition, the Official Statement notes that if these tests were to become invalid through public exposure, the development of new tests would be time consuming and quite costly, and test developers and publishers would have a disincentive to invest in them if the life span of the tests were limited. (*Id.*).

To protect these standardized tests, the American Psychological Association imposes certain ethical rules on its members. Psychologists are only permitted under the APA Code of Conduct to disclose "test data" directly to a patient and his designees

with a release (and to others "as required by law or court order"). (*Id.* at 13-14, APA Code Standard 9.04). Disclosure of test materials is more restrictive. Psychologists must "make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations...." (*Id.* at 14, APA Code Standard 9.11). At times, "test data and test materials overlap" such that the release of test data effectively releases the test materials. (*Id.* at 85, Official Statement). This occurs because, for example, test materials might easily be inferred from test data. (*Id.*). As a result, "even if requirements are met under 9.04, such test release may still conflict with the procedures or principles articulated in 9.11." (*Id.*).

Not surprisingly, the creators of psychological test materials impose contractual obligations on purchasers to avoid disclosure of their tests, and take other measures to restrict access and maintain confidentiality. For example, they place warnings on the test materials that the tests are confidential, protected by copyright, and not to be reproduced in whole or in part without written permission. (*See* PAI Clinical Interpretive Report, at 1).[6] Some tests are not even available for purchase unless one has the requisite minimum qualifications.

Sales of the MMPI-2 test materials, for instance, are restricted by its distributor, Pearson, to those who have Qualification level "C," so neither Plaintiff nor his attorney could purchase the test materials.[7] Pearson cautions that secured tests like the MMPI-

---

[6] Plaintiff's own therapist, Dr. Niedner, testified at her deposition that she would not be permitted to "xerox" one of the tests at issue here, the Beck Depression Inventory, because it is "copyrighted." (Doc. 68-1, at 68-69, Niedner Dep., at 185-86).

[7] Tests with a C qualification "require a high level of expertise in test interpretation, and can be purchased by individuals with: A doctorate degree in psychology, education, or closely related field with formal training in the ethical administration, scoring, and interpretation of

2 are trade secrets, and the confidentiality of test questions, responses, and scores are "paramount to maintaining the integrity, reliability, and validity of [the] tests."[8]  It also warns that "[u]nlike many other types of tests, our Qualification B and C level tests do not consist of a large collection of test items that are rotated.  Rather, these tests have one expensive and highly researched version and should remain intact for 10 to 15 years.  Millions of dollars have been spent on the research and 'norming' (compiling of statistical data regarding results) of the tests.  Any leakage of test items will severely compromise the value and usefulness of the tests."  *See, e.g., Ruston v. Department of Justice*, 521 F. Supp. 2d 18, 21 (D.D.C. 2007) (court finds psychological assessment materials, including MMPI-2, were exempt from disclosure under FOIA based on test publishers' declarations concerning the extensive research costs, risks from public disclosure, and efforts taken to protect the test materials).

According to Dr. Fink's affidavit, the validity of the tests that he administered to Plaintiff "depends upon the test subject's unfamiliarity with the tests and inability to prepare for the tests in advance."  (Doc. 116-1, at 71 ¶ 6).  Moreover, certain of the answers and responses (the test data) are "contained on the test materials and not separate from them."  (*Id.* ¶ 7).  Dr. Fink further stated that, as a licensed clinical psychologist in Illinois, he is subject to discipline for violating the APA ethical rules since the rules are considered by state regulators in determining whether a psychologist has

---

clinical assessments related to the intended use of the assessment.  OR  Licensure or certification to practice in your state in a field related to the purchase.  OR  Certification by or full active membership in a professional organization...that requires training and experience in the relevant area of assessment."  (Doc. 116-2, at 32).

[8]     The language referenced here and in the remainder of the paragraph is from the MMPI-2 test materials as summarized on the record by Respondents' counsel during the December 23, 2015 hearing.  Similar language appears on Pearson's website.  (*See* http://www.pearsonclinical.com/psychology/legal.html#trade, under "Trade Secrets" and "Ethical Issues") (last visited Feb. 8, 2016).

engaged in unethical or unprofessional conduct. (*Id.* ¶ 9) (citing the Illinois Clinical Psychologist Licensing Act, 225 ILCS 15/15(7)).

While ethical and disciplinary rules do not create a privilege, the Federal Rules of Civil Procedure allow courts to issue protective orders or quash third-party subpoenas where a document request would cause a person undue burden. FED. R. CIV. P. 26(c)(1), 45(d)(3)(A)(iii). *See also Walton v. North Carolina Dep't of Ag. and Consumer Servs.*, No. 5:09-CV-302-FL, 2011 WL 2893622, at *2 (E.D.N.C. July 15, 2011) (relying on Rules 26(c) and 45(d) to deny motion to compel psychological testing materials).

**B.      Balancing Against Plaintiff's Need for Test Materials and Raw Data**

Plaintiff asserts that he is entitled to the neuropsychological test materials and raw data under Federal Rule of Civil Procedure 26(a)(2)(B) since the materials are "foundational" for Dr. Yohanna's opinions. (Doc. 118, at 4). He contends that "there is nothing about the questions or the data reported in the tests that requires a psychologist to interpret, and nothing about disclosing those materials in discovery under the existing or a modified protective order [that] will in any way compromise the objectivity or fairness of these tests." (Doc. 134, at 12). Plaintiff proposes that these materials therefore be provided directly to counsel under the existing Protective Order, though he is amenable to unspecified modifications "if the Defendants or Respondents feel additions to the order may be required." (*Id.* at 13). Respondents argue that the Protective Order should instead state that these testing materials are to be produced only to another psychologist designated by Plaintiff and may not be provided to Plaintiff or his counsel.

As the Court observed in *Taylor v. Erna*, Civil A. No. 08-10534-DPW, 2009 WL 2425839 (D. Mass. Aug. 3, 2009), "the most common resolution for this type of dispute has been some compromise between full, unconditioned disclosure and total exemption from the Federal Rules of Civil Procedure." *Id.* at *2. Some courts have held that testing materials should be produced but only to opposing counsel's expert psychologist. In *Collins v. TIAA-CREF*, No. 3:06-CV-304-C, 2008 WL 3981462 (W.D.N.C. Aug. 22, 2008), for example, the court quashed a subpoena seeking to have the defendants' psychologist produce test materials and raw data to a clinical social worker, explaining that it "place[d] an undue burden on [the psychologist] in asking him to violate both his ethical and contractual obligations." *Id.* at *3, 5. Instead, the court gave the plaintiff the option of having the doctor "produce the requested materials to a licensed psychologist . . . to avoid the very serious consequence of the validity of these important tests being compromised." *Id.* at *5. *See also Whitney v. Franklin Gen. Hosp.*, No. C13-3048, 2014 WL 7339213, at *4 (N.D. Iowa Dec. 23, 2014) (ordering production of raw test data "to Defendants' expert . . ., a licensed psychologist."). When materials are not restricted in this way, it is common for courts to issue protective orders that protect the test materials in other ways. The decisions do not always clearly delineate, however, what the provisions of the protective orders are.

In arguing for copies of all the testing materials, Plaintiff relies heavily on *Mayer v. Village of South Holland*, the only case addressing psychologists' disclosure obligations under the Illinois Act. There the plaintiff alleged that she was denied a position as a firefighter-paramedic because of her sex, but the defendant claimed the reason was her failure to successfully complete a psychological test. After the

defendant produced a report from licensed psychologist Roger Hughes, Psy.D. (not designated as an expert witness by either party) that purported to summarize the test results, the plaintiff issued a subpoena seeking the supporting documents, "including raw test data, test protocols, score sheets, notes, reports, . . . rough drafts, [and] letters." *Id.*

Relying on the Illinois Act, Dr. Hughes said he could only produce the requested documents to a licensed psychologist. *Id.* In rejecting this argument, the court first noted that neither side had provided "sufficient information to determine whether the test given by Hughes was a psychological test" within the meaning of the Act. As the court explained, "for Hughes's test of plaintiff to qualify as a psychological test, the test should have been for purposes of a mental health examination, diagnosis, evaluation, treatment, or training." *Id.* at 2. Lacking a sufficient description of the test performed, the court declined to find that Dr. Hughes had met his burden of showing that the test materials fell within the meaning of the statute. *Id.* at *3. In addition, the court held that any concerns about compromising the testing process could be addressed with a protective order that "limits who will see the materials and prevents those persons from further disclosure." *Id.* The court did not provide any further guidance as to the content of the protective order, and it remains unclear who was to be permitted to see the psychological test materials. The docket sheet reflects that the parties never pursued a protective order, and the case was dismissed with prejudice a few months after the opinion was issued. In other words, this Court cannot determine from the decision whether the protective order would have allowed the plaintiff or his attorney to receive copies of all psychological testing materials.

Even if the *Mayer* court had so found, the case is distinguishable from this one for several reasons. First, unlike the psychologist in *Mayer*, Respondents have specifically identified the test materials at issue here. In addition, there is no question that those tests were administered to examine and diagnose Plaintiff's mental health, so Dr. Yohanna could opine as to whether Plaintiff has (or had) PTSD and depression and, if so, the causes. Moreover, the *Mayer* court was not asked to consider the potential impact of the APA Code of Conduct. Even more importantly, unlike the case at hand, the plaintiff in *Mayer* was not considering the possibility of undergoing future psychological testing, and the plaintiff's counsel was not allowed to review (without copying) all of the psychological test materials. For these reasons, this Court does not find *Mayer* instructive here.

Plaintiff also relies on a Colorado case, *Frazier v. Board of County Comm'rs of County of Arapahoe*, Civ. A. No. 08-CV-2730-WYD-BNB, 2010 WL 447785 (D. Colo. Feb. 3, 2010), but this case too is distinguishable. The defendant in *Frazier* subpoenaed the plaintiffs' expert psychologist for "all documents relating to testing and test results," and the psychologist moved to quash based on her obligations under the APA Code of Conduct, as well as contractual concerns about disclosing trade secrets. *Id.* at *3. In denying the motion, the court cited Section 9.04(b) of the Code of Conduct, which allows for the disclosure of test *data* "as required by law or court order," *id.* at *4, but made no mention of test *materials* under Section 9.11 or the heightened concerns associated with that information. The court also relied on *Taylor v. Erna*, 2009 WL 2425839, without acknowledging that the plaintiffs in that case were ordered to produce testing materials to the defendants not only pursuant to a protective order but also

"through an expert."  *Id.* at *3.[9]  For all of these reasons, this Court does not find the holding in *Frazier* persuasive here.

Based on the circumstances presented in this case, the Court finds that an appropriate Protective Order is one that allows Plaintiff to receive (through counsel) copies of the first three items that he seeks: the Raw Data Sheet, the Personality Assessment Inventory (PAI) Clinical Interpretive Report, and the Neuropsychological History Questionnaire ("NHQ").  As for the remaining test materials that Plaintiff seeks, these must also be disclosed but the Protective Order will allow Plaintiff (through counsel) to review the documents but not receive copies.  In addition, these documents must be available to Plaintiff's counsel to use during the depositions of Dr. Yohanna and Dr. Fink.

Production of a copy of the NHQ is appropriate since this is merely a questionnaire completed by Plaintiff and not a neuropsychological test.  For this reason, Respondents withdrew their objection to producing it.  As for the Raw Data Sheet, while Respondents maintained their objection, the Court is not persuaded that disclosure of this document would compromise the objectivity or fairness of the testing process.  As Plaintiff notes, this sheet is an internal form of the University of Chicago Medical Clinic that is used to report the raw and/or scaled scores for a variety of psychological tests referenced (by initials) on the form.  For any test that was performed, the score is filled in on the blank space provided, though Plaintiff's counsel noted that the form completed

---

[9]      In the other case the court cited, *Schmitt v. Beverly Health and Rehabilitation Servs., Inc.*, No. Civ. A. 96-2537-EEO, 1997 WL 728133 (D. Kan. Nov. 19, 1997), the plaintiff's retained expert voluntarily agreed to produce "raw data" and "actual data" pursuant to a protective order without a discussion of test materials.  *Id.* at *4.

for Plaintiff has three tests that are added in handwriting with no scores noted. This form must be produced.

Respondents must also produce a copy of the PAI Clinical Interpretive Report. The PAI is a self-report questionnaire consisting of 344 items designed to assess adult psychopathology. The PAI Clinical Interpretive Report ("CIR") is "the result of a computerized software portfolio associated with the test that scores the PAI and generates a clinical interpretive report based on diagnostic algorithms." (Doc. 134, at 7). Plaintiff provided a lengthy and specific explanation for why he needs a copy of the CIR, namely, to explore the reasons that certain narrative sections of the CIR were included in the reports of Dr. Fink and Dr. Yohanna while other sections were omitted, and why certain scores from the Supplemental PAI Indexes were not discussed. (*Id.* at 7-9). In addition, Plaintiff provided the Court with an internet address where a sample CIR is publicly available. (*See* www.hogrefe.no/Global/Exempelrapporter/PAI Clinical Interpretive Report.pdf) (last visited Jan. 14, 2016). Based on the Court's *in camera* review, several portions of the CIR that was withheld in this case are identical to the sample CIR found on the internet. Given the availability of the sample on the internet and the fact that the CIR consists mainly of test data (not test materials), Respondents must produce it. They may redact, however, those portions of the CIR that are redacted on the sample CIR posted on the internet (where the sample states "Item text was removed from this report for sample purposes."). The unredacted CIR must be available at the depositions of Dr. Yohanna and Dr. Fink. Finally, the Protective Order will require the Raw Data Sheet and PAI to be treated as Attorneys' Eyes Only since

Plaintiff has not yet decided whether he will undergo future psychological testing in this case.

Plaintiff's motion to compel copies of the remaining testing materials is denied. These materials are: the PAI Software Module Item and Response Booklet; the Minnesota Multiphasic Personality Inventory-2nd Edition (MMPI-2) Extended Score Report and Test Manuals; the Trauma-Symptom Inventory-2 (TSI-2) Answer Sheet and Profile Form; the Detailed Assessment of Post-Traumatic Stress-2 (DAPS) Item Booklet, Answer Sheet and Scoring Sheet; the Beck Anxiety Inventory; and the Beck Depression Inventory-II. While it certainly would be much more convenient for Plaintiff's counsel to have his own copies of these testing materials, the Court is satisfied that there is ample justification for a Protective Order that allows disclosure of these materials to occur through counsel's review of the materials along with their availability to counsel at the depositions.

As Respondents note in seeking a Protective Order with the even greater restrictions imposed under the Illinois Act, the "continued objectivity, fairness, and integrity of the battery of tests used by neuropsychologists depends on those tests remaining confidential outside the psychology profession." (Doc. 116, at 6). This Court agrees that these tests are important tools in mental health evaluations and that public disclosure of the tests "would invite coaching of future test takers and manipulation of test performances and would invalidate the tests." (*Id.*). Here, Plaintiff has not foreclosed the possibility that he will undergo future psychological testing in this litigation. In addition, with the availability of the internet and the ease of posting documents on it, the danger of widespread dissemination of psychological test materials

is very real.  Requiring complete copies of neuropsychological tests to be made and produced directly to a party (or their counsel) in every case in which a claim of severe emotional distress or PTSD is made would, in this Court's view, unnecessarily increase the risk that these valuable tests would be rendered invalid and useless.

The Court also finds that the limitations imposed by the Protective Order described in this opinion will not deprive Plaintiff's counsel of the discovery necessary to effectively prepare for the expert depositions.  First, Dr. Yohanna's report described twenty-one sources of information for his opinions, and the IME and neuropsychological testing was only one of the sources.  Second, with regard to that one source, Plaintiff's counsel is being given copies of key documents, namely, the reports of both experts, the Neuropsychological Evaluation Notes from the joint clinical interview, Dr. Yohanna's separate handwritten notes, the NHQ, the PAI Clinical Interpretive Report, and the Raw Data Sheet.  Third, counsel has been permitted to examine *all* of the withheld psychological test materials and may do so again if necessary.  This review has allowed Plaintiff's counsel to identify areas of cross-examination as described in detail in the supplemental pleading.  Fourth, the Protective Order will allow counsel access to the withheld test materials during the depositions of Dr. Yohanna and Dr. Fink.[10]  Lastly, the Protective Order will require Respondents to produce the withheld testing materials to a psychologist designated by Plaintiff in the event that he eventually elects to retain one

---

[10]     Under the Protective Order, the deposition testimony will initially be treated as "Attorneys' Eyes Only" to allow Respondents an opportunity to review the transcripts and designate any portions discussing the test materials and raw data as "Attorneys' Eyes Only."  Of course, Plaintiff may challenge the designation in which event the Court will review the testimony and determine what restrictions are appropriate.  The Protective Order will also provide that the psychological materials that are disclosed in any manner are to be used only for purposes of this lawsuit, are to be filed under seal (assuming there is a need to file them at all), are not to be copied, and are to be returned to Respondents at the conclusion of the case.

given his claim of PTSD with some ongoing symptoms. In sum, Plaintiff is not being denied the discovery that he seeks, but certain limitations are appropriate given the special nature of the materials that are sought.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Compel Expert Opinion Basis Materials (Doc. 107) is granted in part and denied in part.

ENTER:

Dated: February 9, 2016

_____
SHEILA FINNEGAN
United States Magistrate Judge